UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| RONALD JOSEPH JONES,<br>a/k/a RONALD JONES,<br><br>                    Petitioner,<br><br>     vs.<br><br>UNITED STATES OF AMERICA,<br><br>                    Respondent. | CIV. 13-5008-JLV<br><br>[CR. 10-50015-01-JLV]<br><br><br>ORDER |

On January 17, 2013, Petitioner Ronald Joseph Jones, appearing *pro se*, filed a motion (Docket 1) pursuant to 28 U.S.C. § 2255 ("2255 Motion") to vacate or set aside his criminal conviction in United States v. Ron Jones, CR-10-50015-01-JLV (D.S.D. 2012).   Mr. Jones filed a 104-page memorandum and a 419-page supplement consisting of 62 exhibits in support of the petition. (Dockets 2 & 3).   On July 18, 2013, Mr. Jones moved to amend the petition on the basis of Alleyne v. United States, ___ U.S. ___, 133 S. Ct. 2151 (2013). (Docket 25).   Following those submissions, Mr. Jones filed two motions for partial summary judgment, motions for leave to conduct discovery and for an evidentiary hearing, a motion seeking copies of certain materials, two motions for discovery and a motion for appointment of counsel.   (Dockets 28, 33, 40-41, 43 & 46-48).

Pursuant to a standing order of October 16, 2014,[1] the matter was referred to United States Magistrate Judge Veronica L. Duffy pursuant to 28 U.S.C. § 636(b)(1)(B).  On November 4, 2014, Judge Duffy issued a report recommending the court grant the motion to amend the petition on the basis of Alleyne, deny the above-referenced motions and deny the petition with prejudice. (Docket 50 at pp. 64-65).  Pursuant to 28 U.S.C. § 636(b)(1), objections to the report and recommendation were due on or before November 24, 2014.  Mr. Jones timely filed his objections.[2]  (Docket 51).  After the deadline for filing objections, Mr. Jones filed a second motion for appointment of counsel and four motions to supplement the record.  (Docket 52-56).  For the reasons stated below, Mr. Jones' motion to amend the petition and the motions to supplement the record are granted in part and denied in part, his objections are overruled and the report and recommendation is adopted as modified by this order.  Mr. Jones' other motions are denied.

---

[1] The report and recommendation mistakenly identified the standing order as being issued on October 14, 2014.  (Docket 50 at p. 1).  The report and recommendation is modified to reflect this correction.

[2] The court gives Mr. Jones the benefit of the prison mailbox rule when determining the date of filing for his submissions to the court.  Fed. R. App. P. 4(c) "establishes a prison mailbox rule and requires prisoners to deposit their papers with prison authorities by pertinent due dates in order to benefit from the rule."  Grady v. United States, 269 F.3d 913, 918 (8th Cir. 2001).  See also Nichols v. Bowersox, 172 F.3d 1068, 1077 (8th Cir.1999) (en banc) (For purposes of § 2244(d)(1), a pro se prisoner's habeas petition "is filed on the date it is delivered to prison authorities for mailing to the clerk of the court.").  See Docket 51-2 for the date Mr. Jones' objections were placed in the prison mail system.

**ANALYSIS**

Mr. Jones and two co-defendants were charged on February 18, 2010, in a multiple-count indictment.   (CR-10-50015-01, Docket 3).   On October 19, 2010, a superseding indictment was filed.   (Id., Docket 103).   The superseding indictment charged Mr. Jones with count 1, conspiracy to entice potential investors into a business prospectus for Plato Systems through the use of false information and using invested funds for his private expenses; counts 2-30, wire fraud; counts 31-32, mail fraud; counts 33-44, wire fraud; counts 45-49, money laundering; count 60, conspiracy to launder monetary instruments; counts 61-81, engaging in monetary transactions in property derived from specified unlawful activity; and counts 82-84, false statements.   Id.   The principal difference between the original indictment and the superseding indictment is the addition of counts 82-84 charging Mr. Jones with making false statements to a Department of Homeland Security Special Agent during the course of the agency's investigation.   Compare id., Dockets 3 and 103.

On October 3, 2011, the government and Mr. Jones executed a plea agreement and factual basis statement.[3]   (Id., Dockets 295 & 296).   Mr. Jones agreed to plead guilty to count 1, conspiracy in violation of 18 U.S.C. § 371; count 12, wire fraud and aiding and abetting in violation of 18 U.S.C. §§ 2 and

---

[3]On October 2, 2011, the parties informally notified the court of their decision to resolve Mr. Jones' case by plea agreement.   A jury trial was scheduled to begin on the morning of October 3, 2011, (CR-10-50015-01, Docket 156 at p. 2).   The court set a change of plea hearing for 3:30 p.m. on the afternoon of October 3, 2011.

1343; and count 71, money laundering in violation of 18 U.S.C. § 1957(a).   (Id.,

Docket 295 ¶ C).   The critical language of those counts was as follows:

COUNT 1:   Conspiracy (18 U.S.C. § 371)
. . .
37.   On or about between 2004 and 2005, until on or about the date of this Indictment, in the District of South Dakota, and elsewhere, the defendants, Ron Jones . . . and Arland Clark, together with other persons known and unknown to the grand jury, did combine, conspire, confederate, and agree together with each other and other persons known and unknown to the grand jury to commit offenses against the United States of America as follows:

-to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice and attempting to do so, unlawfully, willfully and knowingly did cause to be transmitted by means of wire communications in interstate commerce writings, signs, signals and sounds in violation of Title 18 U.S.C. § 1343, all in violation of Title 18 U.S.C. §§ 371 and 2.

38.   In furtherance of the conspiracy and to achieve the objects thereof, the defendants, Ron Jones . . . and Arland Clark, and their co-conspirators, known and unknown, committed and caused to be committed the following overt acts, among others, in the District of South Dakota and elsewhere:

a.   On or about December, 2004, the defendants, Ron Jones and Arland Clark, met with existing and potential investors at a Christmas party arranged by Jones at the Spearfish Canyon Lodge, near Spearfish, South Dakota. At that time, Jones, assisted by Clark, discussed with potential investors the merits of investing with Plato Systems.

b.   On or about between May 15, 2004, and July 1, 2004, the defendant, Ron Jones, met with prospective investors at the BayLeaf Cafe,

4

> Spearfish, South Dakota, and gave a presentation on Plato Systems to existing and potential investors seeking their investments.

. . .

**COUNT 12: Wire Fraud (18 U.S.C. §§ 1343 & 2)**
**Payments by Investors to Jones by Wire**

39. The allegations in paragraphs 1 through 37 inclusive are hereby realleged and incorporated by reference as though fully set forth herein for the purpose of establishing the existence of a scheme and artifice to defraud.

   On or about the dates set forth below, in the District of South Dakota and elsewhere, the defendants, Ron Jones . . . and Ar1and Clark, aiding and abetting each other, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice and attempting to do so, unlawfully, willfully and knowingly did cause to be transmitted by means of wire communications in interstate commerce writings, signs, signals and sounds, to wit, the defendants, Ron Jones . . . and Ar1and Clark, caused the following interstate wire transmissions to be made in furtherance of the scheme:

   . . .

| COUNT | DATE | INVESTOR | TO | NATURE OF WIRE |
|---|---|---|---|---|
| 12 | 06/23/04 | Shelby McDill | U.S. Bank, CO | $12,000 investment in Plato Systems |

. . .

**COUNT 71: Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity (18 U.S.C. § 1957)**

47. On or about the following dates, in the District of South Dakota and elsewhere, the defendant Ron Jones . . . did knowingly engage and attempt to engage in the following monetary transactions by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is, transfers of funds, such property having been derived from a specified unlawful activity, that is, wire fraud:

5

| COUNT | DATE | AMOUNT | FROM BANK | PAYEE |
|---|---|---|---|---|
| 71 | 06/21/04 | $90,000 | U.S. Bank, CO | Kristen Mericle |

. . . .

(Id., Docket 103 at pp. 1, 12-15 & 24).

At the change of plea hearing the court accepted Mr. Jones' guilty pleas. (Id., Docket 336 at pp. 28-29).   A presentence investigation report ("PSR") was ordered and a sentencing hearing was scheduled for January 30, 2012.   Id. at pp. 44-45; see also id., Docket 299.

On January 25, 2012, Mr. Jones filed a motion to withdraw his guilty pleas.   (Id., Docket 333).   A hearing was held on Mr. Jones' motion on January 27, 2012.   (Id., Docket 339).   During the hearing, Mr. Jones orally moved to withdraw the motion to withdraw his guilty pleas.   Id.; see also Docket 368 at pp. 2.   The court orally granted Mr. Jones' motion.   (Id., Docket 368 at p. 6).   A written order was subsequently filed.   (Id., Docket 349).

Mr. Jones' sentencing was held on January 30, 2012.   (Id., Docket 348; see also id., Docket 366).   Following a two-hour hearing, the court sentenced Mr. Jones to a term of imprisonment on each count of conviction as follows: count 1, 60 months; count 12, 96 months; and count 71, 96 months, to all run concurrently.   (Id., Dockets 348 at p. 1 & 350 at p. 2).

## PETITIONER'S OBJECTIONS

The court reviews *de novo* those portions of the report and recommendation which are the subject of objections.   Thompson v. Nix, 897 F.2d 356, 357-58 (8th Cir. 1990); 28 U.S.C. § 636(b)(l).   The court may then

6

"accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."   28 U.S.C. § 636(b)(1).

Mr. Jones' objections are summarized as follows:

1.   The magistrate judge erred in concluding that whether Plato Systems was a legitimate business is irrelevant;

2.   The magistrate judge erred by failing to find that all non-company expenses were paid from Mr. Jones' salary from Plato Systems;

3.   The magistrate judge erred in concluding Attorney Ellery Grey was not ineffective counsel;

4.   The magistrate erred in concluding Mr. Jones is not entitled to consideration of his exhausted claims because he is actually innocent; and

5.   The magistrate judge erred in concluding Mr. Jones' claim of prosecutorial misconduct was procedurally defaulted.

(Docket 51).   Mr. Jones' later supplements repeat the factual basis for these claims and need not be addressed.   Each of Mr. Jones' objections will be separately analyzed.

<u>PLATO SYSTEMS</u>

Mr. Jones' objection asserts the magistrate judge erred by concluding that whether Plato Systems was a legitimate business concern is irrelevant.   <u>Id.</u> at p. 1.   He claims the case authority relied upon by the magistrate judge, <u>United States v. Hawkey</u>, 148 F.3d 920 (8th Cir. 1998), is "dramatically different from my case."   <u>Id.</u> at pp. 16-17.   Mr. Jones argues "the investors in Plato Systems knew that their investments, not contributions, were to be used to pay

7

the expenses necessary to start the business, including salaries for the officers and employees working full-time on the business." Id. at p. 17.

This objection appears in the context of the magistrate judge's analysis of Mr. Jones' claim of ineffective assistance by his attorney Ellery Grey.   Mr. Jones claims his attorney failed to argue "that Mr. Jones had legitimately been conducting business in Germany for 12 years and that DHS [the Department of Homeland Security] was responsible for ruining that business."   (Docket 50 at p. 46).   By Mr. Jones' claim, his attorney was also ineffective because he failed to ask a German deponent to demonstrate that the Plato Systems software actually worked.   Id. at p. 47.   Finally, Mr. Jones claims his attorney was ineffective because he "refused to depose 38 German witnesses who could have testified that DHS put Plato out of business."   Id. at p. 48.

The magistrate judge found "Mr. Jones cannot show that he was prejudiced by Mr. Grey[] . . . because whether Plato was a legitimate business or not was not relevant to Mr. Jones' guilt."   Id. at p. 47.   "Under Hawkey, whether Plato was a legitimate business at one time and the reason for its going out of business is simply irrelevant."   Id. at p. 48.   The magistrate judge concluded:

> [U]nder Hawkey, whether Plato was a legitimate business or wholly fraudulent does not determine whether Mr. Jones was guilty of wire fraud or money laundering.   Plato could have been, like the charitable event in Hawkey, a legitimate enterprise from which Mr. Jones fraudulently solicited or fraudulently diverted funds, or it could have been a thoroughly fraudulent Ponzi-like scheme.   In the eyes of the law, either could give rise to criminal liability for Mr. Jones.

Id. at p. 37 (referencing Hawkey, 148 F.3d at 923-24).

8

In the objections to the presentence investigation report ("PSR Objections") in advance of sentencing, Attorney Grey argued Plato Systems, although in its organizational phase, was a legitimate company:[4]

> Ron Jones began working on the Plato Systems' business concept much earlier, however, the Defendant does agree that the Plato Systems business was incorporated in the State of Colorado in December 2003. . . . ;
>
> [I]t was understood that the company was in a start-up phase and that the board had not been officially empanelled and that common shares had been issued, rather, these were plans set to take place after the company became viable and had sufficient cash flow. . . . ;
>
> The Defendant maintains that it was his intent that the program launch and be a success.   Defendant did, indeed make two attempts to launch in partnership with American Express and with Talkline GmbH.   Both fell short of expectations. . . . ;
>
> Plato Systems was not in a state of viability, and additionally was not in a state of production and at that time had no current customers . . . . ;
>
> A review of the correspondence Defendant Jones sent to various investors establishes that Defendant Jones was up front about the status of the company and that the business was in a start-up stage . . . . ;
>
> Plato Systems did have a working model early on in 2001 known as Adwin, developed in partnership with OgilvyOne Worldwide Deutschland.  This software system was shown extensively throughout Germany.   Mr. Scheunpflug, in fact was brought into the effort by the programmer of Adwin and asked to begin work on "Version 2."   Version 2 became known as ViDialog. . . . ; and
>
> A review of the information that the Defendant sent to investors, as well as the recorded Bay Leaf Cafe presentation and the Christmas

---

[4]Attached to the PSR Objections were Exhibits 501-06, 512, 529, 551-52, 558, 566, 572, 585-86, 607-11, 622-23, 651-53, 657-61 and 664, consisting of 170 pages supporting the defendant's argument at sentencing that Plato Systems was a legitimate company.

> presentation establish that the Defendant is clear that the program and company itself were in the start-up phases and that in some cases money and investment are necessary to develop the proper tools.

PSR Objections ¶¶ 1, 4, 8, & 10-13.   Through his attorney, Mr. Jones acknowledged "Plato Systems was a legitimate business venture, however, as the Defendant conceded and has admitted to, there were certain aspects of Plato Systems that were fraudulent.   However, this fact does not mean that the entire operation was wholly fraudulent and that all income derived therein would as a consequence be fraudulent."   Id. ¶ 28.

For consideration at sentencing, Mr. Grey submitted 32 support letters and of those 12 were from the European entities and their employees with whom Mr. Jones worked during the time period 2001-2010.   See Support Letters of January 3, 2012, Exhibits 1, 2, 14, 15, 17, 21 & 22; Support Letters of January 13, 2012, Exhibits 2, 4 & 5; and Support Letters of January 20, 2012, Exhibits 1 & 2.

The legitimacy of Plato Systems was discussed during the sentencing hearing.   Mr. Grey stated "[i]t's been our position throughout the litigation, as it is today, that this venture [Plato Systems] was a real idea. . . ."   (CR-10-50015-01, Docket 366 at p. 8:23-25).   He explained "[i]n my sentencing memorandum this morning I cited United States versus Hawkey. . . . On appeal, the Eighth Circuit reviewed that case and found that even though Mr. Hawkey made sure that the charitable events took place, a fraud was nevertheless still in place because Mr. Hawkey had diverted those funds.   We are in a very similar

10

situation here and to think that case is controlling . . . ."  <u>Id.</u> at p. 9:14-10:3.

Mr. Grey discussed resolution of the legitimacy issue:

> Mr. Jones is here today to accept responsibility.  He spent money he shouldn't have.  There are facts at the beginning of the presentence, specifically at [paragraphs] 1 through 39, which Mr. Peterman and I were unable to completely resolve.  We sat down and discussed this issue at length and it appeared to us that it would take quite  a bit of  effort to litigate these issues.  And basically, it boils down to whether or not Plato is a legitimate business venture or not.  Now, at face value that might sound like a very important issue.  But as Mr. Jones is here to accept responsibility for what he actually did, it occurred to us that bringing witnesses in from . . . across the country and overseas to litigate that point, would ultimately not bring much to this Court in terms of using its sentencing discretion.  And I say that because whether or not Plato Systems is real, Mr. Jones is still going to be sentenced with a comment that he admitted [what] he had done.  And assuming that Plato Systems is real, there's certainly an argument that the . . . . government can make that says that's not a mitigating factor, indeed they have done that.
>
> So at this point Mr. Peterman and I have agreed not to litigate these particular issues because of time and complexity involved and, frankly, I am not arguing that as a mitigating factor.  So we decided why bring all this before the Court if it wasn't ultimately going to be something either one of us would argue?
>
> I am bringing that to your attention now because as I present my full presentation to you, you may hear me say some things that are at odds with some of the paragraphs in the first part of the PSI.  I am not bringing those thing[s] up in my presentation as mitigation, but simply as background to explain why things went wrong and how Mr. Jones needs to be culpable for those things.  And so that's the record that I have on those first 39 paragraphs and the objections 1 through 20 that I originally filed.
>
> At this point, Mr. Peterman and I are in agreement that those issues do not need to be litigated.  We don't need to go over the last 10 years of minor details with Mr. Jones coming forward to accept responsibility for the very part of what brings us here today.

<u>Id.</u> at pp. 148:7-149:22.

As part of the pronouncement of sentence the court addressed the legitimate business argument.

> Whether or not Plato Systems was at its inception a legitimate business, there's certainly good arguments the United States makes that it may never have been.   There's certainly very strong indications from the letters, especially from the business people in Germany with whom you worked, that it did appear to them and the person who was working as counsel, that it did appear to them to be a business enterprise which they were assisting [an] American businessman in trying to make an effort and to launch a project. The difficulty here and the reason that you ended up with these charges and the reason you find yourself in court today is the way you handled the investors' money.

Id. at pp. 189:16-190:3.

The court adopts the report's conclusion that in applying Hawkey, it is irrelevant whether Plato Systems was a legitimate business enterprise.   (Docket 50 at pp. 47-48).   Mr. Jones' decision to use Plato Systems to perpetrate his "scheme 'need not be fraudulent on its face but . . . involve[ed] . . . fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension.' "   Hawkey, 148 F.3d at 924 (citing United States v. Coyle, 63 F.3d 1239, 1243 (3d Cir. 1995) (citation and internal quotation marks omitted)).   While all of the investors' money was intended to advance the cause of Plato Systems, Mr. Jones "knowingly diverted these funds for his personal benefit . . . and failed to inform . . . the contributors . . . that he removed the funds for his personal benefit."   Id.

Mr. Jones' first objection to the report and recommendation is overruled.

NON-COMPANY EXPENSES WERE PAID FROM MR. JONES' SALARY

Mr. Jones objects to the report and recommendation claiming it is "wholly silent on the undisputed fact that all of the non-company expenditures detailed in [the] recommendation were sourced and paid from my personal funds." (Docket 51 at p. 2).   He claims "[t]he source of those funds was my agreed-to salary as CEO and Founder of Plato Systems."   Id.   Mr. Jones asserts "[i]t is undisputed that no Plato Systems funds were ever expended for any purpose other than company business, and there is not a single citation in the record suggesting otherwise."   Id.   He argues "a two-year audit of Plato Systems performed by the German Tax Authority, from 2004 to 2009. . . certified that all corporate funds had been properly expended for corporate purposes . . . ."   Id. Mr. Jones asserts "[h]ow an employee spends his . . . salary is a personal matter and not misappropriation of corporate funds."   Id. (emphasis in original).

Relying on an investigative officer's report, the magistrate judge noted that of the approximately $5.3 million dollars disbursed from the Plato Systems accounts between January 2001 and July 2011, Mr. Jones expended some of those funds in the following manner:

> $798,550 to Kristen Mericle, Mr. Jones' girlfriend;
> $308,231 to pay Mr. Jones' personal mortgage;
> $247,507 to pay hotels;
> $58,800 for criminal restitution of Ms. Mericle's brother;
> $102,500 to the brother's attorney;
> $50,000 to pay the brother's bail; and
> $39,534 to pay for a Florida based cruise.

(Docket 50 at pp. 19-20).

13

There is an important legal distinction between spending one's salary on extravagant items and misappropriating corporate funds for fraudulent purposes.    Mr. Jones acknowledged this distinction in the factual basis statement:    "Jones acknowledges that in the course of Clark's recruitment efforts, Clark learned, among other things about Jones which called into question the legitimacy of Jones's investment activities, that Jones was spending large amounts of investor money on non-business purchases.    These included such expenditures as criminal restitution for Jones's girlfriend's brother in California."   (CR-10-50015-01, Docket 296 pp. 1-2).    He also admitted that:

> In the course of receiving monies from investors, which receipt Jones knew was based in part on his misrepresentations to investors constituting wire fraud as set forth above, Jones made many wire transfers of such money to persons and entities unconnected with any Plato business purpose.    Among the transfers in excess of $10,000 constituting money laundering was a $90,000 wire transfer Jones . . . made from his bank account at US Bank in Colorado to his then-girlfriend Kristen Mericle's bank account at Bank of America in California on June 21, 2004 for a non-business related purpose.

Id. at p. 3.

Mr. Jones' submission to support the motion to withdraw his guilty pleas included an unaudited report from his accounting professor.    See id., Docket 333-2.   In an affidavit, the professor concluded the investigative officer's estimate of fraudulent expenditures was too high because of intra-account transfers.   Id. ¶ 7.   The magistrate judge noted "the professor never testified that, in his opinion, there was no loss to victims as a result of Mr. Jones' criminal

acts, or that all the investors' money was legitimately accounted for . . . ."
(Docket 50 at p. 20).

During the January 27, 2012, hearing to consider Mr. Jones' motion to withdraw his guilty pleas, he specifically asked the court to <u>not</u> consider the professor's report or affidavit and asked that they be withdrawn from the record. (CR-10-50015-01, Docket 368 at pp. 5:18-6:7).   When asked if he understood the consequences of withdrawing both the motion to withdraw his guilty pleas and the affidavit of his accounting witness, Mr. Jones declared "I have gone over this in great detail with Mr. Grey and my questions are answered."   Based on that representation and other statements of Mr. Jones which will be discussed later, the court granted the motion to withdraw the motion to withdraw guilty pleas and the oral motion to withdraw Mr. Jones' personal affidavit and the professor's affidavit.   <u>Id.</u> at p. 6:12-19.

At sentencing, a number of witnesses spoke of the financial losses which resulted from the fraudulent conduct of Mr. Jones and his co-defendant, Mr. Clark.   (<u>Id.</u>, Docket 366 at pp. 12-47).   Mr. Jones personally and through counsel agreed with the restitution figure established during the sentencing hearing.   <u>Id.</u> at pp. 140-47.   By agreement of the parties, restitution was set at $1,880,446.   <u>Id.</u> at pp. 146-47.

At no time during the course of the criminal case did Mr. Jones assert these expenditures were anything other than the product of his criminal conduct.   Mr. Jones' solemn declarations under oath at the change of plea

15

hearing and in the subsequent hearings at which he spoke, although not under oath, rebut his habeas declaration that only his salary was used for these non-company expenditures.   "[Mr. Jones'] conclusory argument simply does not satisfy his burden of showing a fair and just reason for permitting a withdrawal of what he had solemnly [stated] under oath."   United States v. Sampson, 606 F.3d 505, 508 (8th Cir. 2010) (internal quotation marks and bracketing omitted).

Mr. Jones' second objection to the report and recommendation is overruled.

INEFFECTIVE ASSISTANCE OF COUNSEL

Mr. Jones objects to the magistrate judge's finding that Attorney Ellery Grey was not ineffective in his representation.   (Docket 51 at pp. 4-11).   Mr. Jones claims that but for Mr. Grey's ineffective representation, Mr. Jones would not have pled guilty.   Id. at p. 4.

Mr. Jones' objections and renewed claims of ineffective assistance of counsel are that his attorney failed to:

1.    Secure German translation services;

2.    Communicate with Dr. Donovan; and

3.    Communicate with Marc Lehmann.

Id. at pp. 4-11.   Each objection will be separately addressed.

German Translation Services

Mr. Jones claims the magistrate judge erred in concluding that permitting Ms. Pierce, a Rapid City, South Dakota, resident to act as an interpreter for Mr.

16

Grey did not constitute ineffective assistance of counsel.   (Docket 51 at p. 5).
Mr. Jones claims Ms. Pierce was the only interpreter used by Mr. Grey to
translate German documents, a task for which she was not qualified.   Id.

Mr. Grey filed an *ex parte* motion for appointment of Ms. Pierce and
outlined her qualifications to assist him in translating German documents.
(CR-10-50015-01, Docket 128).   The court authorized her appointment to assist
Mr. Grey.   Id., Docket 131.   What Mr. Jones fails to acknowledge is Mr. Grey
filed two subsequent *ex parte* motions for appointment of a translator.   In the
second *ex parte* motion, Mr. Grey sought the appointment of Translation &
Multimedia Sales of New York to translate approximately 375 pages of
documents counsel deemed necessary for trial.   Id., Docket 161.   The
documents requiring translation were identified by Mr. Grey as:

a)   signed written agreements between Sony Deutschand and
Ron Jones on behalf of Plato Systems;

b)   signed written agreements with Deutsche Telekom and Ron
Jones on behalf of Plato Systems;

c)   an internal memoranda completed by the Government of
Luxembourg as it relates to the Plato business model concept
and its use by the public schools of Luxembourg;

d)   billing statements from OgilvyOne Worldwide (an advertising
agency affiliated with Ogilvy Mather) for work completed on
behalf of Plato Systems and Ron Jones;

e)   documents from IBM discussing Plato Systems including
various agreements between the two companies;

f)   billing statements from [buw], a company that out-sources
services such as billing and computer sales, for work
completed on behalf of Plato Systems;

17

g)      documents showing the incorporation of Plato Systems in Germany;

h)      the accounting records of Plato Systems as completed by Dr. Funk, a German accountant located in Berlin;[5]

i)      legal opinions written by Plato System's German Attorney Steven Kridlo to Mr. Andreas Von Rooy, a former employee of Plato Systems and an ad representative from OgilvyOne Worldwide;[6] [and]

j)      the Audit completed by FINANZAMT (the German equivalent of the IRS).

Id. at pp. 1-2.   Mr. Grey asserted:

[E]ach of these documents are critical to the defense position at trial, namely that Plato Systems was a legitimate business in the start up phase of conducting business in Germany.   These documents are essential to refute many of the claims that the defense anticipates the government will make at trial, such as Plato Systems being a fraudulent company or a scam.   Given that these documents are in German, they will need to be translated into English for the jury to be able to review and understand.

Id. at p. 2.

A third *ex parte* motion identified documents which required translation.

(Id., Docket 265).   Mr. Grey stated "[t]he documents that are sought to be

translated are as follows: Contracts involving Sony and Deutsche Telekom AG,

T-Com, Records of Certification, T-Mobile Agreements, Correspondence with

IBM, [buw], etc., documents regarding OgilvyOne Worldwide.   These documents

---

[5]While in Germany for a number of depositions in September 2011, Mr. Grey and Mr. Jones met with Dr. Funk to prepare for her deposition.   See CR-10-50015-01, Docket 342-1 at p. 3.

[6]While in Germany, Mr. Grey and Mr. Jones met with his Frankfurt, Germany, attorney.   See CR-10-50015-01, Docket 342-1 at p. 1.   Mr. Grey was also able to meet with Mr. von Rooy to prepare for his deposition.   Id. at p. 2.

are necessary for trial, as they are potential exhibits." Id. at p. 1.   The court entered an *ex parte* order approving the appointment of Link Translations of New York, New York, to perform the translation services and denying the earlier motion for the appointment of Translation & Multimedia Sales as moot.   Id., Dockets 268 & 273.   On November 8, 2011, Link Translations was paid $1,838.13 for translating 35 pages, a total of 8,753 words, from French and German into English.   Id., Dockets 315 & 315-1.

A number of these translated documents are attached as exhibits to the supplement to Mr. Jones' habeas petition.   See Dockets 3-8 [Plato Systems GmbH incorporated], 3-32 [American Express], 3-34 [Vadafone] and 3-56 [Microsoft].   A number of untranslated exhibits were also attached to the supplement.   See, Docket 3-18 [Sony], 3-20 [Microsoft], 3-24 [Deutsche Telekom] and 3-25 through 3-28 [Dr. Funk].   These untranslated documents appear to be the same documents approved for translation and within the group of documents translated by Link Translations.

A number of support letters submitted on Mr. Jones' behalf by Attorney Grey were translated from German into English.   See Support Letters, January 3, 2012: Exhibits 5-6, 9-10, 12, 15-17, 20-22 and 25-30.   Two of these support letters (Exhibit 15 [Ploger] & Exhibit 17 [von Rooy]) and an additional support letter translated into English are exhibits attached to Mr. Jones' supplement to the habeas petition.   (Dockets 3-2, 3-3 and 3-4).

19

By court order the government was required to pay for the translation services associated with the depositions in Germany.   (CR-10-50015- 01, Docket 205).   Mr. Grey's affidavit states, "[p]rior to the depositions taking place, the Government provided me with the name and background credentials of the German/English translator . . . . Based on my research . . . I believed this translator was qualified and sufficiently free from government bias to act as a translator."   (Docket 30 at p. 7 ¶ g).

The report and recommendation resolved the translation services issue as it related to the depositions of German businessmen in Germany.   (Docket 50 at ¶¶ 48-49).   The magistrate judge concluded a separate translator for Mr. Jones was not necessary.   "Mr. Grey conducted research on the translator and satisfied himself the translator was qualified and free from government bias. . . . This conduct is well within the bounds of responsible and competent conduct by defense counsel."   Id. at p. 49 (reference omitted).

Mr. Jones identifies no prejudice by either the documents' translation or the manner in which the Germany depositions were conducted.   Mr. Jones' objection to the report and recommendation on this basis is overruled.

Dr. Donovan

While Dr. Donovan is mentioned in Mr. Jones' habeas brief, there is no claim of ineffective assistance of counsel asserted in either the petition or the accompanying brief.   See Dockets 1 & 2 at p. ¶ 6.   An objection to a report and recommendation may not be premised on a claim not previously presented for

consideration by the magistrate judge.   "[W]hile the Magistrate Judge Act, 28 U.S.C. § 631 *et seq.*, permits *de novo* review by the district court if timely objections are filed, absent compelling reasons, it does not allow parties to raise at the district court stage new arguments or issues that were not presented to the magistrate."   Vice v. Dooley, No. CIV. 14-5076-JLV, 2015 WL 5773403 at *4 (D.S.D. Sept. 29, 2015) (citing Murr v. United States, 200 F.3d 895, 902 n.1 (6th Cir. 2000) (collecting cases in which courts deemed waived issues raised for the first time in objections to a magistrate judge's report and recommendation).

Mr. Jones' objection claims Dr. Donovan would confirm that he attended an executive program, "Technology Management for Information Technology Managers," sponsored by AT&T.   (Docket 51 at p. 6).   Even if considered as a valid objection to the report and recommendation, Dr. Donovan's testimony would not support Mr. Jones' investment scheme claims that he was a college graduate and an IBM Vice President.[7]   Mr. Jones identifies no prejudice he suffered as a result of his attorney's failure to communicate with Dr. Donovan about these matters.   Mr. Jones' objection on this basis is overruled.

Mr. Lehmann

Mr. Jones claims the magistrate judge erred by dismissing his ineffective assistance of counsel claim regarding Mr. Lehmann.   Mr. Jones' objection

---

[7]In Plato Systems' investment brochures, Mr. Jones claimed he was a college graduate and had been an IBM Vice President.   Mr. Jones acknowledged these statements were false during his statement at sentencing. (CR-10-50015-01, Docket 366 at pp. 171:24-172:5).

asserts that both Attorney Grey's Criminal Justice Act[8] vouchers and the statements of Mr. Lehmann back up the claim Mr. Grey did not contact Mr. Lehmann in a timely fashion.   (Docket 51 at pp. 6-7).

Mr. Grey testified he made a number of transcontinental telephone calls to Mr. Lehmann.   (Docket 30 at p. 6 ¶ v).   While Mr. Grey's billing records do not identify the individual being called, his records do note a significant number of calls to Germany during several months prior to Mr. Jones' change of plea hearing.   See CR-10-50015-01, Docket 343-1.   Mr. Grey's billing records indicate he had a telephone conference with Mr. Lehmann on June 17, 2011. (Id., Docket 309-1 at p. 4).   Mr. Grey testified that during this conversation, Mr. Lehmann indicated he was too busy to talk and would call back.   (Docket 30 at p. 6 ¶ v.).   According to Mr. Grey he did not receive a return call from Mr. Lehmann.   Id.   Mr. Grey placed a call to Mr. Lehmann on June 23, 2011. (CR-10-50015, Docket 309-1 at p. 5).   Months later when Mr. Grey was able to visit with Mr. Lehmann he contradicted other discovery.   (Docket 30 at p. 6 ¶ v). Mr. Grey concluded Mr. Lehmann would not make a good witness and his testimony would not have been material to the defense against the government's case.   Id.   Mr. Grey informed Mr. Jones of this decision shortly after the conversation with Mr. Lehmann.   Id.

Mr. Grey's billing worksheet recorded a January 23, 2012, "receipt and review of email from Marc Lehmann" and a "telephone conference with Mr.

---

[8]18 U.S.C. § 3006A.

22

Lehmann" on January 27, 2012.   (CR-10-50015-01, Docket 357-1 at pp. 4-5 & 14).   Mr. Lehmann's e-mail stated:

> [A]t the request of my management to met Mr. Jones and viewed a demonstration of the advertising system ViDialog.
>
> We agreed, that tis advertising system could be interesting for some Mindshare clients and Mr Jones stated, that he will provide a presentation of the system that could be used for Mindshare client discussions.   The discussions happened during the years 2006 and 2007 and included pricing models as well as discussion wich Mindshare client could be interested in the system.
>
> At the end of the year 2007 / beginning 2008 I was told via WPP Group Management in Germany to stop the discussions with Mr. Jones / Plato System immediately.   I was told this order came from the New York Oglivy Office.
>
> At this time we did not had a business realtion, as the discussions hat not be finalysed and not client order hat be set.

(Docket 3-29).[9]

On August 7, 2012, Mr. Lehmann signed a sworn statement addressed to the court.   (Docket 51-1).   This letter was not received by the court until it was attached to Mr. Jones' objections to the report and recommendation.   Mr. Jones claims "Mr. Lehmann could completely rebut the three charges in the Superceding Indictment [false statements to DHS, counts 82-84] as he has now done in his affidavit . . . . With Mr. Lehmann's testimony I was certain that I could successfully rebut these last three counts."   (Docket 51 at p. 7 (referencing 51-1 [Exhibit 43]).

---

[9]Mr. Lehmann's e-mail is presented as originally delivered, without typographic corrections.

Mr. Lehmann's 2012 statement is not helpful to Mr. Jones' claim.   While Mr. Lehmann declared he was willing to testify about his work with Mr. Jones in 2006-2007 "on a starter kit project . . . when [he] was still the Director Digital at 'Mindshare' in Frankfurt am Main, Germany," he stated "[t]o the best of my knowledge and belief, I cannot recall having been contacted by Mr. Grey in writing or by phone at any time after January 24, 2012."   (Docket 51-1).

The 2012 statement contradicts Mr. Lehmann's earlier e-mail.   <u>Compare</u> Dockets 3-29 and 51-1.   "Mr. Lehmann's [e-mail] testimony does not confirm that Plato had a business relationship with Mindshare—instead he states the opposite . . . ."   (Docket 50 at p. 49) (bold removed).   The magistrate judge also concluded "even if Mr. Lehmann's testimony would have confirmed that Plato and Mindshare had a business relationship, this is in the same vein as other evidence proffered by Mr. Jones that would have tended to show that Plato was a legitimate business."   <u>Id.</u> at 49-50.

Mr. Lehmann's 2012 statement does not contradict Mr. Grey's testimony that Mr. Lehmann was not cooperative in returning calls during the earlier time period.   Mr. Lehmann did not speak to any earlier communications, or lack thereof, which may have occurred with Mr. Grey, but only claims there were no communications after January 24, 2012.   (Docket 51-1).

The court finds the magistrate judge properly analyzed Mr. Jones' claim of ineffective assistance of counsel concerning Mr. Grey's work with Mr. Lehmann.

24

Mr. Jones' objection and the evidence submitted to supplement the objection do not overcome the court's conclusion.   Mr. Jones' objection is overruled.

ACTUAL INNOCENSE

Mr. Jones objects to the report and recommendation claiming it "cites not a single case requiring that a claim of prosecutorial misconduct, in order to avoid procedural default principle [sic], must be raised on direct appeal.   There is no such requirement in the Eight[h] Circuit."   (Docket 51 at p. 19).   Mr. Jones' argument is misplaced.

"A motion under § 2255 is not a substitute for direct appeal . . . and is not the proper way to complain about simple trial errors . . . ."   Anderson v. United States, 25 F.3d 704, 706 (8th Cir. 1994) (citation omitted).   "[T]he cause and prejudice exception does not apply to nonconstitutional or nonjurisdictional claims that could have but were not raised on direct appeal . . . . A petitioner simply cannot raise a nonconstitutional or nonjurisdictional issue in a § 2255 motion if the issue could have been raised on direct appeal but was not."   Id. (citations omitted).   "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice' . . . or that he is 'actually innocent.' "   Bousley v. United States, 523 U.S. 614, 623 (1998).

Mr. Jones claims he is actually innocent and was forced to lie when his guilty pleas were entered.   (Docket 51 at pp. 11, 14 & 20).   A petitioner's burden of proof under the actual innocence test is high.   Schlup v. Delo, 513

U.S. 298, 324 (1995) ("To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.").   "[A] petitioner can obtain review of procedurally defaulted claims if he produces reliable new evidence not available at trial which demonstrates that it is more likely than not, that with this evidence no reasonable juror would have convicted him."   Amrine v. Bowersox, 128 F.3d 1222, 1226-27 (8th Cir. 1997) (referencing Schlup, 513 U.S. at 326-38.

"If a petitioner presents sufficient evidence of actual innocence, he should be allowed through this gateway permitting him to argue the merits of his underlying constitutional claims."   Id. at 1227.   "In deciding whether a petitioner has made the necessary showing of innocence, a federal court must make its own determination of whether the 'probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial' is sufficient to warrant consideration of the otherwise barred claims."   Id. (quoting Schlup, 513 U.S. at 330-32).   "The underlying reason for an actual innocence gateway is that the 'quintessential miscarriage of justice is the execution of a person who is entirely innocent.' "   Id. (quoting Schlup, 513 U.S. at 324-26). "[A]n evidentiary hearing is not required on a claim of actual innocence if development of the claim would not establish actual innocence."   Bannister v. Delo, 100 F.3d 610, 617 (8th Cir. 1996).

Mr. Jones' actual innocence claim focuses principally on the issues already resolved above:   Plato Systems was a viable, active business; the non-company expenditures were made from Mr. Jones' salary; and Mr. Lehmann's testimony rebuts the government's claim that Mr. Jones made false statements to the Department of Homeland Security.   For the reasons articulated above, this "evidence" is not "new" as it was known to Mr. Jones that these claims were his defenses to the superseding indictment well before the entry of his guilty pleas.   Johnson v. Norris, 170 F.3d 816, 818 (8th Cir. 1999).

Mr. Jones' post-sentencing claim of actual innocence flies in the face of his multiple declarations acknowledging guilt.   While Mr. Jones may have had a defense to the false statement counts of the superseding indictment, the overwhelming evidence shows he engaged in a conspiracy to defraud Plato Systems investors with the intent to divert corporate funds for his own purposes and engaged in mail fraud and wire fraud to accomplish those goals.

Mr. Jones signed a detailed factual basis statement and then under oath acknowledged every detail in the statement was accurate.   (CR-10-50015- 01, Docket 336 at pp. 25:10-26:5).   Mr. Jones was given ample opportunity to disclaim the voluntariness of, and factual basis for, his guilty pleas.   See id., at p. 26:6-27:4.

In an affidavit filed with the motion to withdraw his guilty pleas, Mr. Jones claimed to be "factually and legally innocent of all the charges contained against me in the Superseding Indictment . . . ."   (Id., Docket 333-1 ¶ 3).   He claimed,

however, "that the jury would convict me despite my innocence, and I had no choice but to enter into a plea agreement." Id. ¶ 6.   Mr. Jones asserted he had "now been contacted by Marc Lehmann and he has informed [sic] that he is prepared to issue a statement, be deposed via video conferencing, or, if the expenses are paid, travel to the United States to testify on my behalf." Id. ¶ 9.

During the motion to withdraw guilty pleas hearing, the court reviewed Mr. Jones' earlier changes of plea with him:

> THE COURT:     I reviewed the transcript of our October 3, 2011 change of plea proceeding where you did enter pleas of guilty in this case to three of the counts, and it appeared to me that were you [sic] well-informed, that you understood your rights, that you understood the consequences of entering your pleas, they were knowing and voluntary pleas, and there wasn't any threat, pressure, or promise made to you.   Do you stand by your pleas of guilty entered on October 3, 2011?
>
> THE DEFENDANT:     I do, Your Honor.
>
> THE COURT:     Do you have any mental reservation whatsoever in maintaining your pleas of guilty to those charges?
>
> THE DEFENDANT:     Not at this point, Your Honor.
>
> THE COURT:     Well, then, let me ask if the point is going to be different on Monday when we get to sentencing?
>
> THE DEFENDANT:     It will not, Your Honor.
>
> THE COURT:     Do you have any question about your legal rights in this matter with regard to Mr. Grey's motion to withdraw your motion to withdraw your pleas of guilty?   Do you understand your rights with regard to that motion?

THE DEFENDANT:      I understand them.   Mr. Grey has at
length explained it to me.

THE COURT:   We are prepared to go forward on hearing on the
motion to withdraw the guilty pleas if you wish to do
that.   Do you understand that?

THE DEFENDANT:      I do understand.

THE COURT:   Is it your decision you want to withdraw the motion
which sought to withdraw those guilty pleas?

THE DEFENDANT:      That is my intent.

THE COURT:   Have you had enough time to confer with your
attorney about the motion to withdraw your motion
to withdraw the guilty pleas?

THE DEFENDANT:      I have, Your Honor.

THE COURT:   Have you been fully satisfied with Mr. Grey's legal
advice and representation concerning that motion?

THE DEFENDANT:      I have, Your Honor.

THE COURT:   Are you prepared to go to sentencing on Monday,
January 30, on the crimes to which you have
entered pleas of guilty?

THE DEFENDANT:      I am, Your Honor.

(CR-10-50015-01, Docket 368 at pp. 3:12-5:6).   Later in the hearing Mr. Jones

stated, "I have gone over this in great detail with Mr. Grey and my questions are

answered."   Id. at p. 6:11-12.   Mr. Jones made no further assertion of

innocence.

Prior to Mr. Jones' personal statement to the court at the time of

sentencing, Mr. Grey summarized his client's personal responsibility for the

criminal conduct which resulted in his guilty pleas and conviction.

29

[T]he most important thing is Ron Jones' acceptance of responsibility.   He's not here today, he's not directed or asked me today to blame anybody else for everything that has happened.   He was CEO of Plato Systems and the responsibility is with him.

There's a factual basis statement which I know you have reviewed that begins to describe what he did. . . . Suffice to say, a tremendous amount of money was spent where it should not have been, including   Ron's girlfriend at the time, Kristen Mericle;   bail money for her brother, Michael; restitution for her brother; a number of other various categories.   He is here today to take full responsibility for that. . . .

[H]e's now in Frankfurt, financial capitol of Germany, if not Europe, and he's associating with people . . . [Platos System outside contacts] and things got away from him in a very serious way.   And you've seen the summaries and you've seen the money that he spent and there's no justification or excuse for that, but that is the explanation for why it happened as opposed to a justification.   Ron thought that once this business launched, that that would just be covered up; that things would just be okay because things would start to become very valuable.   Computers would be sold, issues would happen. . . .

You can't take money that an investor gives to you and say, "I am going to use it for this purpose," and then take some of those funds and divert them to somewhere else.   That's a fraud. . . .

[Y]ou can't . . . tak[e] money from . . . the corporate fund, or the bank account . . . and spend[] it on your girlfriend.   You can't have people sending those things to you through wire because that becomes mail fraud.   So he's guilty of those crimes and he's here to fully accept responsibility for what he did.

There's a few other things that Mr. Jones is going to explain to you, too, that he did wrong; something besides how he spent the money. When he was here in South Dakota, he wasn't exactly honest with his investors.   He claimed to be vice-president of IBM when he was not.   He claimed certain educational credentials that weren't true . . . . We might not be in exact agreement [with the government] on exactly how Mr. Jones always misled with respect to his credentials, but the fact is he did.   And the fact is he is embarrassed for having done that.   And I think he's prepared to tell you that no businessman should be doing that. . . .

30

Id., Docket 366 at pp. 158:6-159:1; 161:10-21; 162:2-13 & 166:4-15.   Mr.

Jones then spoke to the court about his criminal conduct.

> First, Your Honor, let me apologize to the government and to this
> Court for my outburst last week.   I regret that.   But this is beyond
> any comparison the most stressful experience in my life.   Maybe
> even worse by the fact that it is entirely my own doing.   I am forced
> to look at my deeds and explain them . . . I am ashamed and
> humiliated. . . . Spending that much money on my fiancee, no
> matter how well-intended, is inexcusable. . . .
>
> I did not graduate from college and no matter what the reason, I
> should not have made that claim.   I was not a vice-president in IBM
> and should never have claimed to have been.   Both acts were wrong
> and misled potential investors. . . . I fully accept responsibility for
> these wrongful acts I have committed and for the harm they have
> caused others. . . . I fully accept responsibility for these wrongful
> acts I have committed and for harm they have caused others, people
> who trusted me and supported me and my idea. . . .
>
> I am fully responsible for the losses of my supporters and supporters
> have suffered and will not rest until I have repaid them. . . . I worked
> all my life to build a career of accomplishments. I have now
> permanently blemished that lifetime of work.
>
> I put myself and my ego ahead of my family and my mission.   This I
> will never do again.   I will continue to do all in my power to repay
> the money and repair the damage I have done. . . .

Id. at pp. 171:4-15 & 24-25, 172:1-5 & 9-11; 173:9-14 & 16-20.   Mr. Jones'

signed allocution statement mirrored his oral statement to the court.

It is clear from the record on the change of plea, the motion to withdraw

the guilty pleas and the sentencing hearing that Mr. Jones persisted in his guilty

pleas, never claimed his pleas were involuntary and took full responsibility for

his unlawful conduct.   The court finds Mr. Jones' guilty pleas were not a false

declaration of guilt.   Weeks v. Bowersox, 119 F.3d 1342, 1356 (8th Cir. 1997) (J.

31

Loken concurring) ("Unless the habeas petitioner has newly-discovered evidence that his guilty plea was a false declaration of guilt, he should not pass through the actual innocence gateway.").

The court further finds Mr. Jones cannot show that a reasonable jury more than likely would have acquitted him at trial.   Amrine, 128 F.3d at 1230. Mr. Jones' objection "is insufficient to overcome the barrier of procedural default in the absence of a showing sufficient to satisfy Schlup's actual innocence gateway." Brownlow v. Groose, 66 F.3d 997, 999 (8th Cir. 1995).   Mr. Jones' pleas of guilty, his statement of how the offenses occurred, including the conspiracy and financial frauds and his failure to repudiate both his attorney's and the court's statements during the sentencing hearing convince the court that Mr. Jones is not entitled to an evidentiary hearing on this claim.   Weeks, 119 F.3d at 1356; Bannister, 100 F.3d at 617.

Mr. Jones' objection to the report and recommendation on the basis of a claim of actual innocence is overruled.

PROSECUTORIAL MISCONDUCT

The magistrate judge found "Mr. Jones has not demonstrated actual innocence for purposes of excusing his procedural default."   (Docket 50 at p. 41).   For this reason, the magistrate judge recommended dismissal with prejudice Mr. Jones' claim of prosecutorial misconduct.   Id.

Procedural default of a claim requires Mr. Jones prove both elements " 'cause' and actual 'prejudice' . . . or that he is 'actually innocent.'"   Bousley,

32

523 U.S. at 623.   Mr. Jones did not file a direct appeal following his conviction and sentencing.   At no time throughout the habeas proceeding has he "shown cause for his failure to raise his prosecutorial misconduct claim on direct appeal. In other words, he has shown no objective external factor which prevented him from raising the prosecutorial misconduct issue on direct appeal."   Hazelrigg v. United States, No. CIV 12-5034-JLV, 2014 WL 10450598 at *9 (D.S.D. July 29, 2014) report and recommendation adopted, No. CIV. 12-5034-JLV, 2015 WL 5697356 (D.S.D. Sept. 26, 2015) (referencing United States v. Smith, No. 8:04CR190, 2010 WL 481000 (D. Neb. Feb. 4, 2010) (prosecutorial misconduct claim procedurally defaulted because petitioner failed to raise it on direct appeal).   "Because (1) the issue is a 'simple trial error'; (2) he failed to raise the issue on direct appeal, and (3) he has not shown cause or prejudice, he is now barred from raising this prosecutorial misconduct claim in his § 2255 proceeding."   Id.

Mr. Jones' objection that the magistrate judge erred in concluding his claim of prosecutorial misconduct was procedurally defaulted is overruled.

The court finds the remainder of Mr. Jones' arguments in his objections and supplements to his objections are repetitive of his claims analyzed above or otherwise are without merit.

**ORDER**

The court finds the report and recommendation is an accurate and thorough recitation of the facts and applicable case law.   The court further

33

finds Judge Duffy's legal analysis is well-reasoned.   Having carefully reviewed the record in this case and good cause appearing, it is

ORDERED that Mr. Jones' objections (Docket 51) are overruled.

IT IS FURTHER ORDERED that the report and recommendation (Docket 50) is adopted as modified by this order.

IT IS FURTHER ORDERED that Mr. Jones' motion to amend (Docket 25) is granted, but habeas relief is denied on the basis asserted under <u>Alleyne v. United States</u>, ___ U.S. ___, 133 S. Ct. 2151 (2013).

IT IS FURTHER ORDERED that Mr. Jones' motions for partial summary judgment (Dockets 28 & 33) are denied.

IT IS FURTHER ORDERED that Mr. Jones' motions for leave to conduct discovery (Dockets 40, 46 & 47) are denied.

IT IS FURTHER ORDERED that Mr. Jones' motion for an evidentiary hearing (Docket 41) is denied.

IT IS FURTHER ORDERED that Mr. Jones' motion for copies (Docket 43) is denied.

IT IS FURTHER ORDERED that Mr. Jones' motions for appointment of counsel (Docket 48 & 52) are denied.

IT IS FURTHER ORDERED that Mr. Jones' motions to supplement the record (Dockets 53, 54, 55 & 56) are denied.

IT IS FURTHER ORDERED that Mr. Jones' petition (Docket 1) is dismissed with prejudice.

IT IS FURTHER ORDERED that, pursuant to 28 U.S.C. § 2253(c) and Rule 11 of the Rules Governing Section 2255 Cases in the United States District Courts, the court declines to issue a certificate of appealability.   A certificate may issue "only if the applicant has made a *substantial showing* of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2) (emphasis added).   A "substantial showing" under this section is a showing that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).   In other words, a "substantial showing" is made if a "court could resolve the issues differently, or the issues deserve further proceedings."   Cox v. Norris, 133 F.3d 565, 569 (8th Cir. 1997). Mr. Jones has not made a substantial showing of the denial of a constitutional right.

Although the court declines to issue a certificate of appealability, Mr. Jones may timely seek a certificate of appealability from the United States Court of Appeals for the Eighth Circuit under Fed. R. App. P. 22.   See Rule 11(a) of the Rules Governing Section 2255 Cases in the United States District Courts and Fed. R. App. P. 22.

Dated March 30, 2016.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
CHIEF JUDGE

35